**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| ) | |
| WILLIAM VALLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No: 17-cv-10196-DJC |
| ) | |
| ) | |
| POWERTECH INDUSTRIAL CO. LTD. and ) | |
| JONIE CHOU, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| _____ ) | |

**MEMORANDUM AND ORDER**

CASPER, J.                                                                            April 1, 2019

## I.      Introduction

Plaintiff William Valle ("Valle") has filed this lawsuit against Defendants Powertech Industrial Co. Ltd. ("Powertech") and Jonie Chou ("Chou") (collectively, "Defendants"). Valle alleges a breach contract against Powertech based on his 2009 agreement with Powertech (Count I). As an alternative to that claim, he alleges a breach of his 2002 agreement with Powertech (Count II) or a breach of the parties' oral agreement (Count III) or seeks recovery in quantum meruit (Count IV). Against Powertech, Valle also alleges a breach of the covenant of the duty of good faith and fair dealing (Count V) and retaliation in violation of Mass. Gen. L. c. 149, § 148A (Count IX). D. 74. Against both Powertech and Chou, Valles brings a misclassification claim under the Massachusetts Wage Act, Mass. Gen. L. c. 149, § 148B (Count VI) and a claim for unpaid wages under the Massachusetts Wage Act, Mass. Gen. L. c. 149, §§ 148, 150 (Count VII).

As an alternative to his misclassification claim, Valle alleges that Powertech engaged in unfair or deceptive trade practices in violation of Mass. Gen. L. c. 93A, §§ 2, 11 (Count VIII). Valle has moved for partial summary judgment on Counts I, V, VI and VII, D. 77, and Defendants have cross-moved for summary judgment on all counts, D. 82. For the reasons stated below, the Court ALLOWS IN PART Valle's motion, D. 77, and DENIES Defendants' motion, D. 82.

## II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant "bears the burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor," Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (alteration in original) (quoting Anderson, 477 U.S. at 249). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009). On cross-motions for summary judgment, the standards of Rule 56 remain the same, and require the courts "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

### III.    Factual Background

The following facts are undisputed unless indicated otherwise.  The case concerns work Valle performed for Powertech from 2002 to 2017.

#### A.    The Parties

Valle is a salesman based in Massachusetts who formerly worked as a sales representative for Powertech.  D. 79 ¶¶ 1, 22; D. 81 ¶ 6; D. 94 ¶¶ 1, 22.  Powertech is a Taiwanese company based in New Taipei City, Taiwan.  D. 79 ¶ 2; D. 94 ¶ 2.  The company is a "power solutions manufacturer" with a diverse power-related product line that includes surge protectors and uninterruptible power supplies.  D. 79 ¶ 4; D. 94 ¶ 4.

#### B.    The 2002 Agreement

Valle and Powertech began doing business together in 2002, when Valle approached Powertech and Chou with the opportunity to have Powertech manufacture products for American Power Conversion ("APC").  D. 79 ¶ 30; D. 94 ¶ 30.  On September 25, 2002, Valle and Powertech signed a document titled Representative's Agreement (the "2002 Agreement").  D. 81-2.  The 2002 Agreement was between Powertech and United Power Products ("UPP"), with Valle signing in the name of UPP.  Id.  Valle did business under the name UPP from time to time.  D. 81 ¶ 10; D. 79 ¶ 33; D. 94 ¶ 33.  Powertech did not have dealings with anyone other than Valle in its dealings with UPP.  D. 81 ¶ 10.  The 2002 Agreement allocated a five percent commission to UPP on all products sold to APC.  D. 81-2 at 1.  The 2002 Agreement did not have a fixed duration.  Rather, it states:  "[t]his Agreement shall become effective on the date signed by [the] last party hereto to execute the same and shall remain in effect unless Representative shall fail to refuse to continue to provide services hereunder or unless Principal shall cease to sell the Products to [APC]."  D. 81-2 at 2.

While the 2002 Agreement was in effect, Valle brought in other customers, including Para Systems Inc. ("Para").  D. 81 ¶¶ 12-13; D. 94 at 10; D. 79 ¶ 35; D. 94 ¶ 35.  For Para, Valle and Powertech executed a separate agreement in which Valle would receive a fixed five percent commission unless "otherwise by the parties' mutual agree[ment] in writ[ing]" for all sales.  D. 81-3.  Valle attests that he "do[es] not believe that [he and Powertech] entered into separate agreements for each other customer . . . but [he] know[s] [they] were always able to agree on commission rates for the sales [he] obtained."  D. 81 ¶ 13.

In 2008, Powertech asked Valle to modify the 2002 Agreement to lower his commission rate for APC sales from five percent to three and a half percent, and Valle agreed "as an accommodation to Powertech."  D. 81 ¶ 14; D. 79 ¶ 37; D. 94 ¶ 37; D. 94 at 11.  The parties also agreed to some rates that were lower than three and a half percent for the sale of particular products.  D. 81 ¶ 19.

### C.    The 2009 Agreement

#### 1.    Negotiations Over the 2009 Agreement

In September 2009, Powertech informed Valle it wished to enter into one commission agreement applicable to several customers.  D. 84-12; D. 79 ¶ 38; D. 94 ¶ 38.  Valle responded that he wished to keep the existing agreement in place for APC.  D. 84-13; D. 79 ¶ 39; D. 94 ¶ 39.  In response to Valle's input, Powertech agreed to include the following provision in the new agreement:  "Upon termination of this Agreement, Bill [Valle] shall be entitled to payment of commission on all orders placed by American Power Conversion for the products by the accounts for two years, or mutually agreed upon settlement."  D. 84-14; D. 81-9 at 2; see D. 84-5 at 17.  Subsequently, Valle wrote to Powertech "I think it [may be] a good idea to list all the commissions for the various companies in the agreement.  You can list them as an addendum.  What do you

think?" D. 84-15. Powertech demurred, responding "[our] suggestion is don't make the agreement complicate[d]; otherwise we will need to amend the addendum often." Id.

On December 20, 2009 Powertech and Valle signed a new agreement (the "2009 Agreement"). D. 81-9; D. 79 ¶ 42; D. 94 ¶ 42. The 2009 Agreement states: "Powertech agrees to provide Bill [Valle] a commission of the parties' mutual agreed percentage in writing for the payment [] made by the listed customers (as attachment) and the parties can add other customer[s] to the foregoing list hereafter." D. 81-9 at 1. The 2009 Agreement did not specify a commission rate. Id. Rather, the payment section provides as follows:

> The payment means that the listed customers pay Powertech for the orders of the finished products and excludes from any the expense or costs of any parts, components, materials, NRE charges, safety license charges, tooling charges and other similar expenses or costs. For example, in the case the percentage is 5% and the invoices are summed to $10,000 (including tooling charges $1,000), Bill [Valle] will be given a commission of $450. (10,000-1,000)* 5% = 450.

Id.

The 2009 Agreement specifies that Powertech would make all payments to William Valle Associates, Inc. Id. Powertech paid the commissions to William Valle Associates, Inc. D. 84-5 at 32. Valle is the President of William Valle Associates, Inc. D. 84-5 at 3.

The 2009 Agreement contains a confidentiality provision that requires Valle to keep all information and documents about Powertech confidential for five years after the termination of the Agreement. D. 81-9 at 1. The 2009 Agreement does not contain a non-competition clause. Finally, the 2009 Agreement states that it "supersedes all prior agreements and communications between the parties with respect to the subject matter hereof." Id. Valle attests that he understood the 2009 Agreement would not change his relationship with Powertech and that all his existing commission rates would remain in place. D. 81 ¶¶ 15, 17. At his deposition, however, he testified that he believed the 2009 Agreement replaced the 2002 Agreement in terms of his relationship

with Powertech and that he agreed the 2002 Agreement was not in effect after December 2009. D. 84-5 at 15.

### 2. Commission Payments Under the 2009 Agreement

From 2009 to the end of 2016, the parties were able to agree on Valle's commissions, as envisioned in the 2009 Agreement. See D. 81-9 at 1 (agreeing to provide Valle "a commission of the parties' mutual[ly] agreed percentage in writing"). Powertech asserts, and Valle agrees, that after signing the 2009 Agreement, "the parties subsequently [came] to several agreements concerning the commission rates—[] through schedules, emails, and subsequent commission payments." D. 83 at 12; D. 89 at 12.

The parties agree on the general mechanisms used to determine and negotiate payments after they signed the 2009 Agreement. Before making commission payments to Valle, Powertech would prepare and send an invoice to Valle identifying the proposed commission amount for each sale. D. 80-1 at 9. Joanna Sun ("Sun"), a sales manager at Powertech, maintained a running set of spreadsheets listing commissions for customers and product sales that she used to calculate Valle's commissions. D. 80-1 at 9; D. 80-4; D. 80-5; D. 80-2 at 11; D. 94 at 28-29. Valle testified that he received supporting documentation for the invoices "occasionally." D. 84-5 at 18-19. In at least one instance, Valle requested the details of a proposed commission on an invoice, and Powertech provided a breakdown of the payments. See D. 81-20. Generally, Valle would sign the invoices and send them back to Powertech. D. 81 ¶ 25. Valle believed his signature was required to initiate an international wire transfer from Powertech. Id. Upon receipt of the signed invoice, Powertech would wire payment to Valle in the name of William Valle Associates, Inc. D. 81 ¶ 26; D. 84-5 at 18-19; see D. 84-24 (reflecting Powertech invoices signed by Valle). In the early years of Valle's relationship with Powertech, Valle would check the invoices for accuracy,

6

but he "eventually stopped doing this [] because [he] assumed that the commission amounts were correct given [his] long-standing relationship with Powertech." D. 81 ¶ 24. Valle attests that he "did not understand that by signing an Invoice [he] was agreeing that the undisclosed commission rates used to calculate the total commission amounts shown on the Invoice were correct." D. 81 ¶ 25.

The parties agree that Powertech "frequently sought to renegotiate [Valle's] commissions, particularly if Powertech was designing a new product line." D. 79 ¶ 63; D. 94 ¶ 63. The negotiations proceeded largely without incident before 2016. Powertech would update the spreadsheets with the commission rates as the parties reached new agreements. D. 80-2 at 10. In several instances, Powertech requested to lower Valle's commissions based on their current profits and costs and Valle agreed. See, e.g., D. 81-10; D. 81-25.

Various iterations of the payment detail spreadsheets reflect the parties' negotiations. For example, both parties filed the spreadsheet that tracked the parties' negotiations over APC commissions in 2011. D. 81-16; D. 84-20. Next to the 2011 column, if Valle agreed with the proposed rate in the 2011 commission column, Sun wrote "OK." D. 81-16; see D. 89 at 5. If Valle did not approve, he would suggest a different amount, and Sun recorded that amount and either "OK" or a counteroffer on the spreadsheet next to Valle's proposal. See D. 84-20 at 2. During the 2011 negotiations, Powertech and Valle ultimately exchanged approvals for commission rates for APC varying from one to two and a half percent. Id.

In 2013, the parties underwent similar negotiations about APC commissions. For some APC products, Powertech did not discuss changes to Valle's commissions with Valle. Sun explained that because there were "too many APC [products], sometimes it was discussed,

sometimes it was not. We [were] not able to discuss the commission by each [product], that is why we offer him commission invoice as final confirmation." D. 92-6 at 1.

Although parties largely agree on the structure of the commission negotiations from 2009 to 2017, they disagree about Powertech's obligations to pay those rates. According to Valle, the parties understood that the commission rates in effect prior to the 2009 Agreement would stay in effect under the Agreement, unless renegotiated. D. 81 ¶ 17. As an example, Valle points to his commissions on sales to Powertech's customer Para. For sales to Para, Valle received a five percent commission prior to the execution of the 2009 Agreement and continued to receive that five percent commission after the 2009 Agreement took effect. See D. 92-4. Valle also relies upon two documents entitled "APC 3.5% Commission Agreement," which reflect commissions on APC products to be paid with three and a half percent commissions to Valle both before and after the 2009 Agreement went into effect. D. 92-3; D. 92-5; see D. 92 at 1-2. Powertech disputes Valle's characterization of the parties' agreement, arguing that their refusal to include a schedule of commissions in the 2009 Agreement demonstrates that the parties had not reached an agreement on the commission rates and that the entire 2009 Agreement is therefore invalid for lack of the inclusion of a material term. D. 94 at 12-13. Powertech also disputes that for customers other than Para, Valle was entitled to a fixed rate for all sales. D. 94 at 13.

### 3. *Termination of the 2009 Agreement*

Valle and Powertech did business together uninterrupted from 2002 to 2017. D. 79 ¶ 44; D. 94 ¶ 44. Valle alleges that towards the end of the parties' relationship, in 2015, Powertech began "unilaterally changing Valle's commission rates when Powertech unilaterally determined that its own gross profit on a particular product was too low." D. 78 at 9. Valle relies upon a spreadsheet with notations by Powertech showing changes in 2015 and 2016 to earlier commission

rates. D. 80-4. Valle argues that because Powertech has not identified a "writing" in which Valle agreed to these changes, Powertech owes Valle the commission rates initially listed on the spreadsheets, which he "largely agree[s] are correct." D. 78 at 10. Valle also asserts that the correct rates are contained in the spreadsheets and supplemental correspondence with Powertech filed at D. 81-16, D. 81-19, D. 81-21, D. 81-25, D. 81-26 and D. 81-28. D. 97-1 at 6.

On a Powertech invoice dated November 8, 2016, Valle signed his name and for the first time wrote "accepted as partial payment." D. 84-24 at 13. Four days after Valle filed this lawsuit, in a letter dated February 9, 2017, Powertech terminated the 2009 Agreement with Valle, effective May 16, 2017. D. 84-26. On March 15, 2017, Valle notified Powertech that he would accept the latest invoice only as "partial payment" because of a "new situation" with Powertech that required him to go back and review all past commission statements. D. 84-27; see D. 84-24 at 14. It is undisputed that Powertech never paid Valle the amount reflected on the March 2017 invoice ($19,855.17). D. 80-1 at 13. From March to October of 2017, Powertech and Valle negotiated over the disputed commissions. D. 84-28 (reflecting emails about commission payments during this time period). It is undisputed that Powertech has not made any payments to Valle since 2016. D. 80-2 at 19; see D. 79 ¶ 115; D. 94 ¶ 115. Valle and Powertech also have not reached a mutually agreeable settlement concerning the two-year payout provision. D. 79 ¶ 117; D. 94 ¶ 117. Powertech continues to make sales to APC.[1] D. 80-2 at 9.

### D. Sales at Powertech and Valle's Role

Powertech has an internal sales division with seven employees. See D. 92-9 (showing Powertech organization chart); D. 92-11 at 4. Powertech's website offers over 100 products for

---

[1] Powertech does not dispute that it still sells products to APC but clarifies that "Powertech currently sells products to Schneider Electric which markets certain products branded APC." D. 94 ¶ 122.

sale.  D. 90 ¶ 77.[2]  Powertech employees in the sales division receive and respond to inquiries initiated on its company website.  D. 80-2 at 6; D. 94 at 3.  Powertech also produces catalogs from which customers can order products.  D. 79 ¶ 7; D. 94 ¶ 7.

Stephanie Peng ("Peng") is a senior sales manager in the sales division who testified as a Rule 30(b)(6) witness for Powertech.  D. 80-1 at 4.  Peng testified that her duties in the sales division are to "develop new clients and to follow up on the current clients' projects."  Id.[3]  Peng also oversees six team members whose job is to "follow up on their respective clients" who are "mostly" in the United States.  Id.  According to Peng, "most" Powertech sales are direct sales made through the sales division, rather than through sales representatives or brokers.  D. 80-1 at 7.

Sun reports to Peng within the sales division.  D. 80-2 at 5.  She also testified as a Rule 30(b)(6) witness for Powertech.  D. 80-2.  Sun described her job responsibilities as follows:  "I [am] in charge of the sales accounts that are under my responsibility.  For example, if a client raises an RFQ [Request for Quotation], then we would have to follow up, and if we would get the deal, then we would have to follow up with the product development projects, but we would have to maintain the product that we have on-line in order to help carry out daily business and answer any questions that they may have."  D. 84-30 at 2.  Sun testified that there are two other employees in her division in sales at Powertech:  Rose and Sandra.  Sun testified that Sandra has similar duties to her, while Rose is "more in charge of the back office activities, for example . . . processing the

---

[2] See POWERTECH, https://www.power-tech.com.tw/en/power_list.php (last visited Mar. 21, 2019).

[3] Powertech does not dispute Peng's description of her job but highlights the "limitation" of Peng's understanding of the phrase "develop new clients" given the language barrier.  D. 79 ¶ 13; D. 94 ¶ 13.  Given that Peng gave the testimony through an interpreter and did not submit any errata within the thirty days provided for in Fed. R. Civ. P. 30(e)(1)(B), see D. 80-1; D. 97-1 at 9, the Court concludes that it is permissible to consider it for the purposes of this motion.

deals and orders, making shipments and making payments." Id. Unlike Valle, a supervisor assigns Sun and her colleagues to specific customer accounts. D. 84-30 at 2-3. Powertech does not pay Sun or Sandra any commissions. D. 84-30 at 3.

As a sales representative, Valle helped promote Powertech sales from both existing customers and potential new customers. D. 81 ¶ 7. Sun testified that Valle's job as a sales representative was to "proactively contact customers, communicate with the customers, and help Powertech maintain and develop business." D. 80-2 at 7. Valle sometimes travelled with customers. D. 84-5 at 26; D. 90 at 27. Valle brought in several new customers other than APC, including Para. See D. 81 ¶¶ 12-13; D. 81-3. Valle did not have full discretion to decide which customers to pursue because he first had to check with Powertech to prevent any potential conflicts. D. 81 ¶ 8; D. 79 ¶ 27; 94 ¶ 27. Valle testified that he "didn't have the authority to design, to quote [or] to manufacture . . . . [His] job was really just making the introduction and then monitoring the introduction as time went on." D. 84-5 at 22. In comparison to the internal sales force, Valle could "move quicker" with customer prospects, D. 80-2 at 7, could not provide quotations to customers and, when it came to "the follow-up course on projects, that would all be done by [the internal sales force]," like Sun, id.

It is undisputed that Powertech did not set Valle's work hours or schedule. D. 90 at 22. Valle also did not have a minimum number of hours required work hours, did not have a Powertech business card, did not wear a Powertech uniform, was not required to report his efforts to anyone at Powertech and did not receive "official" performance reviews. D. 90 at 22-23. From 2002 to 2017, Valle's work with Powertech provided his main source of income, although he did work on "a few [other] minor projects." D. 81 ¶ 11. When Valle was terminated, he was not replaced by another outside sales representative. D. 79 ¶ 29; D. 94 ¶ 29.

## IV.    Procedural History

Valle instituted this action on February 3, 2017, D. 1, and filed the operative amended complaint, D. 74, on January 24, 2019. Valle has now moved for partial summary judgment, D. 77, and Defendants have moved for summary judgment on all claims, D. 82. The Court heard the parties on the pending motions on March 5, 2019 and took the matters under advisement. D. 102.

## V.    Discussion

### A.    Breach of the 2009 Contract (Count I)

Valle asserts a breach of contract claim against Powertech for failure to pay Valle commissions due to him under the 2009 Agreement. Valle has moved for partial summary judgment as to liability only for this claim, D. 78 at 20; D. 97-1 at 1, and Defendants have cross-moved for summary judgment on the claim, D. 82 at 1.

In determining what substantive law is applicable, the Court considers the choice-of-law rules in the forum state, here, Massachusetts. Levin v. Dalva Bros., Inc., 459 F.3d 68, 73 (1st Cir. 2006) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). Massachusetts law provides that the Court "shall take judicial notice of the law . . . of a foreign country whenever the same shall be material." Mass. Gen. L. c. 233, § 70. An initial step in a choice-of-law analysis is "to determine whether there is an actual conflict between the substantive law of interested jurisdictions." Levin, 459 F.3d at 73.

The 2009 Agreement states that it "shall be interpreted in accordance with the laws of the Republic of China." D. 81-9 at 1. Nonetheless, both parties cite almost exclusively to Massachusetts law. Where Valle references Taiwanese law, he emphasizes its similarities to Massachusetts law. See, e.g., D. 89 at 11-12. The declaration of Bo-Sen Von, a Taiwanese

attorney, similarly emphasizes overlaps in Taiwanese and Massachusetts law. See D. 91 at 7.[4] To

the extent that it engages with Taiwanese law, Powertech claims that the result would be the same

under the laws of both jurisdictions. See D. 93 at 8 (arguing that "[t]he Taiwanese law cited by

Valle does not change [the] outcome"). Because neither party has established that the content of

Taiwanese law creates an actual conflict with Massachusetts contract law, the Court interprets the

Agreement pursuant to Massachusetts law. See Silica Tech, L.L.C. v. J-Fiber, GmbH, Civ. A. No.

06-10293-WGY, 2009 WL 2579432, at *11 (D. Mass. Aug. 19, 2009) (explaining that "the

proponent for the application of [international] law [] has the burden to show the relevant content

of foreign law"); see also Minebea Co., Ltd. v. Papst, 444 F. Supp. 2d 68, 186 (D.D.C. 2006)

(applying the law of the forum because "[i]t would impose an 'extreme burden on the court' to

conduct further independent research on the German law . . .") (quoting Fed. R. Civ. P. 44.1

advisory committee's note to 1996 amendment).

     To prove a breach of contract claim under Massachusetts law, a plaintiff must show there

was an enforceable contract, the defendant breached that contract and the plaintiff sustained injury

as a result of the defendant's breach. Linton v. N.Y. Life Ins. & Annuity Corp., 392 F. Supp. 2d

39, 41 (D. Mass. 2005) (citation omitted). "To prove the existence of a contract, a party must show

two things:  the intention of the parties to be bound, and agreement on the material terms of the

contract." Glyka v. New England Cord Blood Bank, Inc., Civ. A. No. 07-10950-DPW, 2009 WL

1816955, at *3 (D. Mass. June 25, 2009) (citing Hunneman Real Estate Corp. v. Norwood Realty,

Inc., 54 Mass. App. Ct. 416, 421 (2002)). "It is axiomatic that a contract's essential terms must be

---

[4] Defendants have moved to strike the declaration of Bo-Sen Von based on Valle's failure to
disclose expert testimony in a timely matter. D. 98. Because the declaration does not affect the
Court's analysis, however (as explained above), the Court DENIES Defendants' motion to strike
as moot.

'sufficiently definite so that the nature and extent of the obligations of the parties' are ascertainable." Mass Cash Register, Inc. v. Comtrex Sys. Corp., 901 F. Supp. 404, 417 (D. Mass. 1995) (quoting Simons v. Am. Dry Ginger Ale Co., 335 Mass. 521, 523 (1957)).  Nonetheless, "the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract" if the parties have "progressed beyond the stage of 'imperfect negotiation.'" Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000) (citation omitted).

Powertech argues that the 2009 Agreement is unenforceable based on the failure to include a material term, i.e., a set commission rate.  Powertech characterizes the 2009 Agreement as an unenforceable "agreement to agree."  D. 83 at 4.  The Supreme Judicial Court has explained that "[w]hile it is true that an action may be brought upon a contract which contemplates another more formal contract, an agreement to enter into a contract which leaves the terms of that contract for future negotiation is too indefinite to be enforced."  Caggiano v. Marchegiano, 327 Mass. 574, 580 (1951) (internal citation omitted).  Alternatively, Powertech argues, the agreement on a commission rate could be construed as an unfulfilled condition precedent to the performance of the 2009 Agreement.  Valle counters that the 2009 Agreement was a valid contract and incorporated pre-existing commission rates that were reflected in Powertech's spreadsheets and payment details and adjusted over time.

The Court concludes that a valid contract existed between the parties because they intended to be bound by the 2009 Agreement and agreed on its material terms.  Although the intent to be bound is "is generally a question of fact," Sinotau Pharm. Grp. v. Navidea Biopharm., Inc., 211 F. Supp. 3d 375, 379 (D. Mass. 2016) (citation and internal quotation mark omitted), here the parties both signed a document that explicitly memorialized their intent to be bound and there are no

disputed facts relevant to this issue. Powertech—the party contesting the document's enforceability—has also not argued that it did not intend to be bound.

As to agreement on the material terms of the contract, the Court concludes that the 2009 Agreement incorporated the Powertech spreadsheets memorializing Valle's commission rates, which existed prior to 2009 Agreement, to supply the contract's term as to same (or, alternatively, as the condition precedent, for agreement as to commission rates). "To incorporate extrinsic material, the language of the contract 'must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract.'" AECOM Tech. Servs. v. Mallinckrodt LLC, 117 F. Supp. 3d 98, 114 (D. Mass. 2015) (quoting NSTAR Elec. Co. v. Dep't of Pub. Utils., 462 Mass. 381, 394 (2012)). Here, the 2009 Agreement expressly references a separate document "in writing" that reflects the commission rates for Valle and anticipates that the document will change overtime as the parties "add other customer[s]." D. 81-9 at 1. Sun maintained such a document, and both parties relied upon it as the source for Valle's commission rates, with Valle's signature on the invoices serving as "final confirmation" (according to Powertech). D. 92-6 at 2.

Even if the 2009 Agreement had not expressly incorporated the Powertech spreadsheets, the Court concludes the contract would still be enforceable based on the parties' regular course of dealings during the pendency of the Agreement. Powertech argues that because it explicitly denied Valle's request to include his commission rates as part of the 2009 Agreement, see D. 84-15, the Agreement did not contemplate the incorporation of the spreadsheets or any other extrinsic agreements. The Court, however, finds this argument unavailing. The Massachusetts Uniform Commercial Code, Mass. Gen. L. c. 106, § 2-202, permits a court to consider the course of dealings between parties to the extent such dealings explain or supplement existing contractual terms. Mass Cash Register, 901 F. Supp. at 418; see Roma v. Raito, Inc., Civ. A. No. 13-cv-10297-LTS, 2015

WL 1523098, at *3 (D. Mass. Mar. 31, 2015) (citing RESTATEMENT (SECOND) OF CONTRACTS § 223 cmt. b (1981)) (applying Massachusetts law and explaining that the "course of dealing between the parties gives meaning to or supplements their agreement and there is no requirement that [the] agreement be ambiguous before the court can be guided thereby"); Janssen Biotech, Inc. v. Celltrion Healthcare Co., 296 F. Supp. 3d 336, 343 (D. Mass. 2017). Although Powertech did not formally incorporate the spreadsheets as an addendum to the Agreement, it is undisputed that both parties continuously relied on the rates listed in the spreadsheets for at least six years.

Having concluded that a valid contract existed, the Court next considers whether Powertech breached the 2009 Agreement. Valle alleges two sets of breaches under the 2009 Agreement: 1) Powertech's failure to pay him agreed-upon commission rates beginning in 2015 and 2) Powertech's failure to pay him under the two-year tail provision for APC sales after the termination of the 2009 Agreement.

As to the commission payments that Valle alleges were "unilaterally changed" in beginning in 2015, the Court concludes that there are disputed issues of material fact that preclude summary judgment at this juncture. A reasonable factfinder could conclude either that Powertech breached the 2009 Agreement by changing Valle's commission rates without his approval or that Valle agreed to those changes by signing the invoices without contesting the amounts for all but two of the invoices. The Court, therefore, denies both parties' motions for summary judgment as to the breach of contract claim for commissions allegedly owed from 2015 until the termination of the 2009 Agreement.

As to the two-year tail provision for post-commission sales on APC products, the Court holds that based on the undisputed evidence, Powertech has breached its duty under the contract to make the required payments to Valle. It is undisputed that Powertech has not made any

payments to Valle since the termination of the 2009 Agreement since 2017, Powertech and Valle explicitly negotiated over and decided to include the tail provision in the Agreement and Powertech continues to sell products to APC. Although the amount of damages under the tail provision has not been established at this stage, Valle has moved for summary judgment only on the question of liability. Accordingly, the Court allows Valle's motion and holds that Powertech is liable for the two-year tail payments on APC products as a matter of law, with the amount of damages to be determined.

### B.   Breach of the 2002 Contract (Count II)

Valle asserts a breach of contract claim against Powertech based on the 2002 Agreement between the parties "in the alternative" to his breach of contract claim under the 2009 Agreement. D. 74 at 10. Valle argues that, to the extent the 2009 Agreement did not take effect for failing to include a material term, then the 2002 Agreement continued in full force and effect. D. 74 ¶ 79. Because the Court has concluded the 2009 Agreement formed a valid contract, the Court denies Defendants' motion for summary judgment on this claim, Count II, as moot.

### C.   Breach of Oral Agreement (Count III)

Valle asserts this claim against Powertech "in the alternative" to his claims for breach of contract under the 2009 Agreement and the 2002 Agreement. D. 74 at 11. Valle argues that if the Court concludes the parties did not have a written agreement, then they had an oral agreement whereby Powertech agreed to pay Valle a commission for sales to four customers at agreed-upon commission rates. D. 74 ¶ 87. Because the Court has concluded the 2009 Agreement formed a valid contract, the Court denies Defendants' motion for summary judgment on this claim, Count III, as moot.

**D.**     **Quantum Meruit (Count IV)**

Valle seeks to recover in quantum meruit from Powertech "in the alternative" to his breach of contract claims. D. 74 at 12. Because the Court has concluded the 2009 Agreement formed a valid contract, the Court denies Defendants' motion for summary judgment on this claim, Count IV, as moot.

**E.**     **Breach of the Covenant of Good Faith and Fair Dealing (Count V)**

Valle asserts this claim against Powertech for allegedly "failing to pay Valle commissions when due and in the amounts due, failing to negotiate commissions in good faith, and seeking to reduce and set commission rates without Valle's knowledge and/or consent." D. 74 ¶ 102. Valle has moved for partial summary judgment on liability only for this claim, D. 78 at 20; D. 97-1 at 1, and Powertech has cross-moved for summary judgment, D. 82 at 1.

"Under Massachusetts law, '[e]very contract implies good faith and fair dealing between the parties to it.'" Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013) (alteration in original) (quoting T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 569-70 (2010)) (internal quotation marks omitted). The implied covenant provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-72 (1991) (quoting Drucker v. Roland Wm. Jutras Assocs., Inc., 370 Mass. 383, 385 (1976)). This covenant "guarantee[s] that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 441 Mass. 376, 385 (2004).

The Court concludes that summary judgment is unwarranted for either Valle or Powertech on this Count because of the disputed facts concerning the parties' agreement (or lack thereof) to

modify the commission rates reflected in D. 81-16, D. 81-19, D. 81-21, D. 81-25, D. 81-26 and D. 81-28 (which Valle asserts are the agreed-to rates). A reasonable factfinder could determine there had been a breach of the covenant, based on the conclusion that Powertech unilaterally changed Valle's commission rates and intentionally withheld those changes from Valle so that he would not contest them. A reasonable factfinder could also conclude, however, that there had not been a breach because Powertech disclosed the commissions it would pay Valle through the invoices and Valle consented to those changes by signing the invoices. The Court, therefore, denies summary judgment on this claim.

### F. Misclassification Under Massachusetts Wage Act, Mass. Gen. L. c. 149, § 148B (Count VI)

Valle alleges that Powertech and Chou violated the Massachusetts Wage Act by misclassifying him as an independent contractor and failing to pay benefits and wages due to him. D. 74 ¶¶ 111-113. The Wage Act provides that "[a]ny entity and the president and treasurer of a corporation and any officer or agent having the management of the corporation or entity shall be liable for violations of this section." Mass. Gen. L. c. 149, § 148B. Valle argues that, accordingly, Chou is liable under the Wage Act to the same extent as Powertech. Valle has moved for summary judgment as to liability only for his misclassification claim, D. 78 at 20; D. 97-1 at 1, while Defendants have moved for summary judgment on the claim, D. 82 at 1.

In Massachusetts, Mass. Gen. L. c. 149 § 148B governs whether an individual providing services is to be classified as an independent contractor or as an employee. Under this law, employees are afforded the protection of wage and overtime laws, while independent contractors are not. See Mass. Gen. L. c. 149; Mass. Gen. L. c. 151; see also Ferrara v. Voyport II, LLC, No. 16-cv-12024-LTS, 2018 WL 5555066, at *2 (D. Mass. Oct. 29, 2018).

Under the Wage Act, the "threshold question is whether the plaintiff[] provided services to the defendant[]," which creates a presumption that the individual is an employee. Sebago v. Bos. Cab. Dispatch, 471 Mass. 321, 327 (2015). If that threshold is met, a worker is classified as an employee unless the employer establishes that:

> (1) the individual is free from control and direction in connection with the performance of the service both under his contract for the performance of service and in fact; and (2) the service is performed outside the usual course of the business of the employer; and, (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. L. c. 149, § 148B. This is a conjunctive test in which the employer bears the burden of proof, and the failure to meet any one of the three elements has the effect of precluding independent contractor status. See Scalli v. Citizens Fin. Grp., Inc., Civ. A. No. 03-12413-DPW, 2006 WL 1581625, at *14 (D. Mass. Feb. 28, 2006). The fact that a putative employee has signed an agreement classifying him as an independent contractor, rather than an employee, does not dictate the outcome of the legal analysis. See Ruggiero v. Am. United Life Ins. Co., 137 F. Supp. 3d 104, 113 (D. Mass. 2005).

Valle contends that Powertech has failed to prove any of the three prongs but exclusively analyzes the second prong. Valle argues that Powertech cannot and has not shown the services Valle performed, undisputed here, were "outside the usual course of the business of the employer." Mass. Gen. L. c. 149, § 148B. The Supreme Judicial Court has given the following "illustrations of services within the usual course of an employer's business: art instructor services performed on a 'regular or continuous' basis within an art museum, musicians performing as a 'usual and customary' activity at a 'beer bar,' and an organist playing music as a 'usual part of' a funeral home's business." Carey v. Gatehouse Media Mass. I, Inc., 92 Mass. App. Ct. 801, 807 (2018) (quoting Athol Daily News v. Bd. of Review of the Div. of Emp't & Training, 439 Mass. 171, 179

(2003)).  An additional factor for the court to consider is whether the services are necessary to the employer's business or merely incidental.  <u>Sebago</u>, 471 Mass. at 333.  The Massachusetts Attorney General has given the following example of an incidental service.  "An accounting firm hires an individual to move office furniture.  Prong two is not applicable (although prongs one and three may be) because the moving of furniture is incidental and not necessary to the firm's accounting business."  Advisory, Attorney General's Fair Labor Division on Mass. Gen. L. c. 149, s. 148B, 2008/1 (the "AG Advisory").[5]

Two cases from 2015, upon which both parties rely, inform the Court's analysis.  In <u>Sebago</u>, the Supreme Judicial Court considered whether licensed taxicab drivers could be properly classified as independent contractors under the Wage Act.  <u>Sebago</u>, 471 Mass. at 322.  In considering the second prong of the independent contractor test, the court held that the transportation of passengers for fares was not in the ordinary course of business for either the defendant medallion owners or defendant radio association business.  <u>Id.</u> at 335-36.  The court noted that the defendants were "not concerned with the results of the plaintiffs' operations, as [plaintiffs] [were] not required to remit a percentage of their revenues" to defendants.  <u>Id.</u> at 334. The plaintiffs, the court reasoned, no more than "incidentally contribute[d] to the owners' advertising revenues," which placed the drivers outside the defendants' usual course of business. <u>Id.</u> at 334-35.

---

[5] Courts have relied on the AG Advisory and have explained that the Massachusetts Attorney General's interpretation of the Wage Act is "entitled to substantial deference."  <u>Martins v. 3PD, Inc.</u>, Civ. A. No. 11-11313-DPW, 2013 WL 1320454, at *13-14 (D. Mass. Mar. 28, 2013) (relying upon the AG Advisory).

Next, the Court looks to Ruggiero.  In Ruggiero, a court in this district weighed the issue of whether an insurance agent who sold insurance and annuity products for two insurance agencies had been improperly classified as an independent contractor by those agencies.  Ruggiero, 137 F. Supp. 3d at 107.  The court determined that the insurance agencies were "not in the business of selling insurance products directly; [they were] in the business of determining which products to make available, structuring and drafting the policies, obtaining regulatory approval for these policies, and investing the policy premiums."  Id. at 118 (emphasis in original).  Of particular relevance to this case, the court noted observed that "[a]ny manufacturing business is, of course, dependent on such ancillary functions as product sales and advertising.  But this dependency does not automatically incorporate the ancillary functions as product sales and advertising."  Id. at 119.

Valle also relies upon a recent case from this district that draws on the holdings of Sebago and Ruggiero.  In Ferrara v. Voyport II, LLC, the defendant company, Voyport, and the plaintiff worker, Ferrara, signed a "Contractor-Consulting Agreement" pursuant to which Ferrara agreed to act as a "direct business to business sales representative" of Voyport.  Ferrara, 2018 WL 5555066, at * 1.  The agreement gave Ferrara the "right to promote the sale of the [p]roduct and related services . . . through tactics deemed appropriate by the Company."  Id.  It also contained a non-competition clause.  Id.  Ferrara sued Voyport under the Massachusetts Wage Act when he was not paid sums due under the contract, including commissions.  Voyport's CFO and co-defendant argued that Voyport was an "operating entity" and "had no actual customers."  Id. at *4.  The court nonetheless held that Voyport had failed to satisfy its burden under the second prong because Ferrara was responsible for carrying out Voyport's "primary business objective—to promote and sell 'the Product' to business communities."  Id. at *4.  Thus, the court held that Ferrara had been improperly classified as an independent contractor and granted summary judgment to him.  Id.

The Court applies the authorities cited to determine the "usual course" of Powertech's business. The Supreme Judicial Court has recognized that "a purported employer's own definition of its business is indicative of the usual course of that business." Sebago, 471 Mass. at 333 (citing Athol Daily News, 438 Mass. at 171). On its website and in its motion papers, Powertech describes itself as "a leading power solutions manufacturer with a diverse power-related product line that ranges from surge protection to power management." D. 84 ¶ 3. The Court also takes note of the "Customer Care" section of Powertech's website (where customers can login and obtain pricing information), Powertech's sales catalog and Powertech's 2011 company profile, which touts its "prompt repl[ies] to customer request[s]." D. 92-11 at 25. Finally, the Court considers the "realities of the [Defendants'] actual business operations." Sebago, 471 Mass. at 335. Although Powertech's "Core Competence" as described on its website does not include "sales," Powertech has a sales division with seven employees that makes direct sales to customers or commercial resellers. The sales division, rather than external sales representatives, is responsible for "most" of Powertech's sales. And, when Powertech terminated Valle, Powertech did not replace him with another outside sales representative.[6]

The Court also compares Valle's role to that of the employees in the sales division. See Martins, 2013 WL 1320454, at *13 (stating that the "'[b]ottom line' is: if the defendant were to have employees, whether those employees 'would perform the same services as those whom the Agreement term[ed] as 'independent contractors'") (alteration in original) (quoting Rainbow Dev.

---

[6] Powertech asserts that it did not replace Valle after his termination because "he became less crucial to the relationship between Powertech and his primary customer, APC" over time. D. 93 at 10. Valle testified that even before 2015, APC moved many of their jobs to the Philippines or to Hong Kong, which resulted in Valle having less direct contact with APC. D. 94-1 at 6-7. Regardless of the reason, Powertech's decision not to replace Valle with another sales representative underscores the importance of sales by the internal sales division at Powertech.

LLC v.Mass. Dep't of Indus. Accidents, No. SUCV2005-00435, 2005 WL 3543770, at *3 (Mass. Super. Ct. Nov. 17, 2005) (internal quotation marks omitted)).  Peng testified that her duties as an employee in the sales division are to "develop new clients and to follow up on the current clients' projects," while Sun testified that Valle's duties were to "proactively contact customers, communicate with the customers, and help Powertech maintain and develop business."  Viewed in the light most favorable to Powertech, the differences between Valle and the employees in the sales division are that Valle, unlike the others, could not provide quotations to customers, could choose which customers to pursue (subject to Powertech approval), was expected to work "quicker" in forming customer relationships and sometimes travelled with customers.  He also conducted fewer follow-up with customers once the relationship had been initiated and was paid through commissions.

Based on the analysis above, the Court concludes that Valle performed services in the usual course of Powertech's business.  This case is more akin to Ferrara than to Sebago or Ruggiero. Here, as in Ferrara, Powertech's sales were not merely incidental to its business.  Rather, Powertech made "most" of its sales through its internal sales department, which employed seven workers as employees.  Those employees' duties were substantially similar to Valle's, including the development of new clients and the maintenance of existing client relationships.[7]  Unlike in Sebago, Powertech was financially dependent on Valle's sales and profited off each sale he facilitated.  See Beck v. Mass. Bay Techs., Inc., Civ. A. No. 16-10759-MBB, 2017 WL 4898322, at *8 (D. Mass. Sept. 6, 2017) (noting that "[a]lthough a shared economic interest alone does not show necessity or an employer-employee relationship, financial interdependence and a reliance on

---

[7] Although Valle, unlike the putative employee in Ferrara, did not sign a non-competition clause, the court in Ferrara did not find the existence of the clause to be dispositive, nor have Defendants argued that it should be so.

a worker's services for revenue and survival is evidence that a worker is an employee"). Unlike the defendant company in <u>Ruggiero</u>, Powertech was involved in directly selling its products through its internal sales division. <u>Cf.</u> <u>Ruggiero</u>, 137 F. Supp. 3d at 119 (explaining that "[t]his manufacturing-sales dichotomy may seem formalistic, but it is grounded practically in business arrangements where the manufacturer does not engage in direct sales but instead empowers individuals to engage in their own, separate businesses that involve – but do not consist exclusively of – the sale of the manufacturer's products"). Because the independent contractor test is conjunctive, and Powertech cannot prevail on the second prong, the Court concludes that Valle is entitled to summary judgment with respect to liability on his misclassification claim against Powertech. The Court reaches the same conclusion with respect to the misclassification claim against Chou, who is subject to personal liability by virtue of his position as President of Powertech. <u>See</u> <u>Ferrara</u>, 2018 WL 5555066, at *5.

G. **Unpaid Wages in Violation of the Massachusetts Wage Act, Mass. Gen. L. c. 149, §§ 148B, 150 (Count VII)**

Valle alleges that by failing to pay Valle his wages in the full when due, Defendants are liable under the Wage Act. D. 74 ¶¶ 120-121. Valle has moved for partial summary judgment as to liability only for this claim, D. 78 at 20; D. 97-1 at 1, and Defendants have cross-moved for summary judgment on the claim, D. 82 at 1.

Because the Court has determined that Valle was an employee of Powertech, Valle is eligible for the protections of the Wage Act. The Wage Act applies to employee's commissions "when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee." Mass. Gen. L. c. 149, § 148.

For commissions to be "definitely determined" under the Wage Act, they must be "arithmetically determinable." McAleer v. Prudential Ins. Co. of Am., 928 F. Supp. 2d 280, 287 (D. Mass. 2013) (quoting Wiedmann v. Bradford Grp., Inc., 444 Mass. 698, 708 (2005)). Valle claims the correct rates are contained in the spreadsheets and supplemental correspondence with Powertech filed as D. 81-16, D. 81-19, D. 81-21, D. 81-25, D. 81-26 and D. 81-28. D. 97-1 at 6. He contrasts them with the spreadsheets showing the rates to which Powertech stipulates it relied. See D. 96 at 1-2, 21-27. He has also provided a sample calculation of how the total amount of the March 2016 invoice would differ for sales made to Tripp Lite (one of Powertech's customers) using rates he and Powertech relied upon, respectively. Compare D. 97-7 (reflecting a total commission amount of $7,111.97 for Tripp Lite products on the March 2016 invoice, based on Powertech's calculations), with D. 97-8 (reflecting a total commission amount of $12,743.21 for Tripp Lite products on the March 2016 invoice, based on the rates to which Valle contends the parties agreed). Although the Court does not accept these calculations for the purposes of determining damages, the Court relies upon them in concluding that the allegedly unpaid commissions are arithmetically determinable as a matter of law.

Given that the Court has already determined there is a question of disputed material fact as to which commission rates the parties agreed upon, as was required by the 2009 Agreement, and the commissions are arithmetically determinable, the Court denies both parties' motions for summary judgment on the issue of unpaid wages. See Ellicott v. Am. Capital Energy, Inc., Civ. A. No. 14-12152-FDS, 2016 WL 7799635, at *5 (D. Mass. Apr. 28, 2016).

H.     **Mass. Gen. L. c. 93A, §§ 2, 11 (Count VIII)**

Valle brings this claim against Powertech "in the alternative" to his misclassification claim. D. 74 at 15. Valle asserts that if he was not an employee of Powertech, then Powertech is liable

to Valle for its unfair and deceptive practices.  D. 74 ¶ 123.  Because the Court grants summary judgment to Valle on his misclassification claim, the Court denies Defendants' motion for summary judgment on this alternative claim as moot.

## I.      Retaliation in Violation of Mass. Gen. L. c. 149, § 148A (Count IX)

Valle brings a retaliation claim against Powertech, asserting that Powertech terminated Valle because he sued to collect on his commissions.  D. 74 ¶ 130.  Valle contends this retaliatory termination violates Mass. Gen. L. c. 149, § 148A.  Only Powertech has moved for summary judgment on this claim.

Under Massachusetts law, it is unlawful for an employer to "discharge[] or in any other way discriminate[] against any employee because such employee has . . . instituted, or caused to be instituted any proceeding under or related to [Mass. Gen. L. c. 149]."  Mass. Gen. L. c. 149, § 148A.  Powertech disputes Valle's claim that it terminated him because he filed this lawsuit. D. 94 at 35.  Rather, Powertech asserts that it terminated Valle for the reasons stated in the email filed at D. 81-29.  Id.  In that email, Peng wrote to Valle on August 30, 2016 (approximately six months prior to Valle filing this lawsuit) informing him that Powertech's financial division was questioning the further need for a sales representative, especially given that Powertech's overall "profits of general products [were] very low."  D. 81-29 at 1.  Valle argues that the temporal connection of only six days between his filing the lawsuit and his termination demonstrate that Powertech's true motive was one of retaliation.  Because there are disputed issues of genuine material facts necessary to resolving the issue of retaliation, the Court denies Powertech's motion for summary judgment on this claim and reserves the question for the jury.  See Mogilevsky v. Wellbridge Club Mgmt., Inc., 905 F. Supp. 2d 405, 413 (D. Mass. 2012) (denying summary

judgment on a retaliation claim under the Wage Act because the issue turned on a determination of the employer's "motive and intent," which was disputed).

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Valle's partial motion for summary judgment in part on Count I (as to the validity of the 2009 Agreement and liability for the two-year tail provision) and in part on Count VI (as to liability for misclassification), and DENIES Valle's motion as to Counts V and VII, D. 77, and DENIES Defendants' motion for summary judgment on Counts I, V, VI, VII and IX, D. 82.  The Court DENIES Defendants' motion for summary judgment on Counts II-IV and Count VIII as moot.

Accordingly, the matters going to the jury are as follows.  As to Count I:  whether there was a breach of contract as to commissions (other than the two-year tail provision, which the Court has found to be a breach as a matter of law); as to Count V:  whether the failure to pay commissions was also a breach of the implied covenant of good faith and fair dealing; and as to Count IX:  the retaliation claim in all respects.[8]

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[8] The Court will take up at the final pretrial conference with counsel whether the damages as to Counts VI, the misclassification claim,  and the unpaid wages claim under Count VII should go to the jury.